UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| PATRICIA "KAY" WHATLEY, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:21-CV-01185 |
| | ) | |
| v. | ) | JUDGE DAVID C. JOSEPH |
| | ) | |
| JEROME HOPEWELL; | ) | MAGISTRATE JUDGE PEREZ-MONTES |
| | ) | |
| and XYZ INSURANCE COMPANIES | ) | |
| | ) | |
| Defendants. | ) | |

## FIRST AMENDED COMPLAINT

COMES NOW Plaintiff, Kay Whatley, by and through her undersigned counsel, to amend her Complaint as follows:

Plaintiff Patricia "Kay" Whatley brings this this suit against her former employer, Alexandria City Marshal Jerome Hopewell, alleging violations of Title VII of the Civil Rights Act and the Louisiana Constitution, Title I of the Americans with Disabilities Act (discrimination and retaliation), and the Louisiana Employment Discrimination Act.

## I.    INTRODUCTION

1.    Plaintiff Patricia "Kay" Whatley worked at the Alexandria City Marshal's Office as a deputy marshal.

2.    Throughout her employment at the Alexandria City Marshal's Office, Ms. Whatley's coworkers and superiors subjected her daily to a pattern of verbal and physical sexual harassment. The harassment involved the use of a TASER on Ms. Whatley's buttocks, slapping Ms. Whatley's buttocks, sniffing her hair, requests that Ms. Whatley perform sexual acts, and rumors about Ms. Whatley performing sexual acts.

3.      After Ms. Whatley suffered an on-the-job knee injury in 2017 and had to work in the office rather than in the field, the sexual harassment drastically increased.

4.      Ms. Whatley reported the sexual harassment to her superiors, City Marshal Jerome Hopewell, and Chief Deputy Steve Boeta. Ms. Whatley's complaints were not only ignored, but were met with open hostility.

5.      In addition to the sexual harassment, Defendant discriminated against Ms. Whatley due to her knee injury, which is serious enough to be considered a disability.

6.      Despite the fact that accommodations were available, Ms. Whatley's requests for these accommodations went unanswered.

7.      Rather than risk further injury, Ms. Whatley reluctantly took extended medical leave. When Ms. Whatley was able to return to work, Defendant retaliated against her for requesting an accommodation and hiring an attorney.

8.      Then, the very same day that Ms. Whatley filed her EEOC charge, Defendant Hopewell explicitly disciplined Ms. Whatley in writing because she had "threatened to sue" the City Marshal's Office.

9.      Ms. Whatley now seeks to enforce her rights through this lawsuit.

## II.      JURISDICTION AND VENUE

10.      Plaintiff brings this action pursuant to Title VII of the Civil Rights Act and other statutes. Jurisdiction is based on 28 U.S.C. § 1331 (federal question) and § 1343 (civil rights). Plaintiff further invokes the supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367 to hear claims arising under state law.

11.      Venue in this Court is proper pursuant to 28 U.S.C. § 1391 as a substantial part of the events giving rise to Plaintiff's claims arose in the Western District of Louisiana, and because Defendant Hopewell resides in the District.

12.      Ms. Whatley has exhausted all administrative remedies by filing a charge with the Equal Employment Opportunity Commission on January 13, 2020. The EEOC issued a right to sue letter on March 2, 2021.

## III.      PARTIES

*Plaintiff*

13.      Plaintiff Patricia "Kay" Whatley is an adult citizen of the State of Louisiana and domiciled in the Western District of Louisiana. She worked at the Alexandria City Marshal's Office, where she experienced sexual harassment, discrimination on the basis of her disability, and retaliation.

*Defendants*

14.      Upon information and belief, Defendant Jerome Hopewell is of the full age of majority and is domiciled in the Western District of Louisiana. In his official capacity, Jerome Hopewell is the decision maker and highest authority as City Marshal of the Alexandria City Marshal's Office. As such, he has employed more than fifteen (15) employees, thereby qualifying as a "employer" under the ADA. 42 U.S.C. § 12111(5).

15.     City Marshal Hopewell is being sued in his official capacity for all claims.

16.     The Alexandria City Marshal's Office, at all times relevant to this litigation, has employed more than fifteen (15) employees, thereby qualifying as a "covered entity" under Section (2) and (5) of the Americans with Disabilities Act. 42 U.S.C. § 12111(2), (5), and employed more than twenty (20) employees as required for an "employer" under the Louisiana Employment Discrimination Law, La. R.S. 23:302(2).

17.     During the time period at issue in this litigation, Ms. Whatley was an "employee" of City Marshall Hopewell and the Alexandria City Marshal's Office as defined in 42 U.S.C. § 12111(4) and La. R.S. 23:302.

18.     Defendants XYZ Insurance Companies 1-10 are not-yet-identified insurance companies that hold policies that cover any or all of the co-Defendants for their actions alleged herein.

19.     Except as otherwise indicated, each defendant is a joint tortfeasor with every other defendant under Louisiana Civil Code Art. 2324.

## IV.     STATEMENT OF FACTS

20.     On June 29, 2017, Ms. Whatley was hired as an Administrative Assistant in the Alexandria City Marshal's Office.

21.     The Alexandria City Marshal's Office serves the Municipal Court for the City of Alexandria. The marshal and deputy marshals execute all orders handed down by the court.

22.     As an Administrative Assistant, Ms. Whatley's job duties included filing documents, collecting fines, and preparing papers for court.

23.     In November 2017, Ms. Whatley was promoted to Deputy Marshal. In this role, Ms. Whatley was a law enforcement officer who worked in the courtroom two days per week and served papers and warrants on the other days.

24.     She was also provided with a company car.

25.     Ms. Whatley's supervisor was Rhonda Hennigan, the Head Clerk of the Alexandria City Marshal's Office.

26.     Ms. Hennigan reported to Defendant Jerome Hopewell, the City Marshal of Alexandria.

27.     In January 2018, Ms. Whatley suffered a knee injury while completing mandatory training at the Alexandria Police Academy.

28.     At the time of injury, Ms. Whatley was five weeks into her academy training.

29.     She was completing a rigorous running workout when something popped in her knee.

30.     Thereafter, the Alexandria City Marshal's Office did not require other employees to train at the Alexandria Police Academy.

31.     Other employees, including Head Clerk Rhonda Hennigan and Deputy Mike Norwood, were given the option to train at the Corrections Academy, which did not require running.

32.     Ms. Whatley returned to work on February 3, 2018.

33.     She was removed from the field and given a position at the front desk manning the front door and watching the metal detector, which allowed her to sit in a chair approximately 95% of the time.

34.     Although Ms. Whatley had completed the firearm training at the Alexandria Police Academy, Defendant Hopewell would not allow Ms. Whatley to carry a gun.

35.     Defendant Hopewell allowed all the male deputies to carry a gun, even those who had not completed the firearm training course.

36.     Defendant Hopewell provided all male deputies with a bullet proof vest, but would not give one to Ms. Whatley.

37.     Ms. Whatley was the only female deputy.

38.     Prior to her injury, when Ms. Whatley was promoted to a deputy marshal position, Defendant Hopewell and others occasionally made sexual comments about Ms. Whatley.

39.     After her injury, when Ms. Whatley was removed from the field, the sexual harassment escalated in frequency and extreme salaciousness that caused Ms. Whatley severe emotional distress.

40.     Ms. Whatley was sexually harassed by City Marshal Jerome Hopewell, Chief Deputy Steve Boeta, Deputy Chris Pruitt, and Deputy Harry Robertson.

41.     Approximately 5-6 lewd comments were directed at Ms. Whatley *daily* by these supervisors and coworkers.

42.     Ms. Whatley was also subject to unwanted physical contact, including Defendant Hopewell and his employees sniffing her hair, slapping her buttocks, and shocking her with a TASER.

43.     Defendant Hopewell regularly approached Ms. Whatley's from behind to sniff her hair without Ms. Whatley's consent.

44.     Defendant Hopewell regularly made comments about his preferences regarding women's appearances to Ms. Whatley.

45.     For example, he told Ms. Whatley he preferred women who had French manicures.

46.     Defendant Hopewell often commented on the fit of Ms. Whatley's clothing, told her when he liked her make up, and requested that she put more make-up on or fix her hair differently.

47.     Chief Deputy Boeta would approach Ms. Whatley from behind, give her shoulder massages without her consent, and hold her body against his.

48.     Deputy Chris Pruitt frequently commented on the size of Ms. Whatley's breasts, e.g., "Your boobs are huge today. Can I touch them?" He would also sniff her hair, and state that he wanted Ms. Whatley to sit on his face, "Come sit on my face."

49.     Deputy Harry Robertson would ask to see Ms. Whatley feet and noted anytime she had polish on her toes. He commented to Ms. Whatley, "a girl with clean feet takes care of her vagina." Deputy Robertson told Ms. Whatley and others that he bet Ms. Whatley shaved her vagina.

50.     Defendant and others spread false rumors that Ms. Whatley had an affair and had sent people nude photographs.

51.     Defendant Hopewell also publicly disclosed and openly discussed Ms. Whatley's private medical information, health issues, and encouraged others to likewise mock Ms. Whatley for her limitations and restricted duties.

52.     Defendant Hopewell joked aloud in front of everyone about Ms. Whatley having a colonoscopy.

53.     While laughing, Defendant Hopewell even admitted that he had probably violated HIPAA.

54.     Ms. Whatley's supervisor, Rhonda Hennigan, taking cues from Defendant Hopewell, told other employees, including Jaqueline McCoy, that Defendant could not wait to get Ms. Whatley out the office and it was only a matter of time Ms. Whatley would be gone.

55.     Ms. Hennigan also told other individuals about Ms. Whatley's private medical conditions.

56.     At times, Defendant Hopewell would disregard Ms. Whatley's work restrictions and assign her to positions that required her to stand for eight hours.

57.     On September 7, 2018, Ms. Whatley underwent surgery for the torn meniscus in her right knee.

58.     On January 17, 2019, Ms. Whatley reported sexual harassment to her superiors: City Marshal Jerome Hopewell and Chief Deputy Boeta.

59.     Ms. Whatley also complained about the disclosure of her private medical information.

60.     During this meeting, Ms. Whatley asked her co-worker Deputy Butch MacKey to accompany her as a witness.

61.     In response, Defendant Hopewell said he would have a meeting and get things straightened out. However, the hostility, retaliation, and harassment escalated.

62.     When a class on ethics and sexual harassment was required after Ms. Whatley's report, Ms. Whatley was not only made to take the class, but was forced to complete the course for everyone else in the office, including her coworkers and superiors.

63.     Afterwards, when coworkers and superiors sexually harassed Ms. Whatley they would joke, "I guess we need to have another sexual harassment class."

64.     Around April or May 2019, Deputy Pruitt and Deputy Robertson shoved Ms. Whatley up against the wall in the hallway and Deputy Pruitt used a TASER in "drive-stun mode" on Ms. Whatley, electroshocking her right buttock.[1]

65.     Ms. Whatley immediately felt the pain of the electric shock and the attack left her with a painful bruise that lasted for several days. Deputy MacKey witnessed this assault and battery.

66.     On numerous occasions thereafter, Deputy Pruitt and Deputy Robertson would pull out the TASER and charge it to make the clicking sound as if they were going to use it on Ms. Whatley.

67.     Deputies Pruitt and Robertson often stood behind Ms. Whatley to scare her when they did this. Each time, Ms. Whatley was placed in apprehension of bodily harm, fearing she would be tased again.

68.     In Fall 2019, Ms. Whatley was required to return to the Alexandria Police Academy for training.

69.     Ms. Whatley requested an accommodation – to attend the less physically demanding Corrections Academy training.

70.     Defendant Hopewell allowed Deputy Norwood and Head Clerk Hennigan to attend the Corrections Academy training as an alternative to the Police Academy.

71.     However, despite having had knee surgery less than a year ago, Ms. Whatley's request for this accommodation was denied.

---

[1] "The drive stun technique involves placing the end of the Taser directly on the person, without the cartridge containing the metal probes . . .  Each application of the drive stun technique delivers a jolt of electricity for about five seconds." *Carroll v. Ellington*, 800 F.3d 154, 164 (5th Cir. 2015)

72.     Less than one-year post-surgery, Defendant Hopewell required Ms. Whatley to return to the Alexandria Police Academy where she was forced to run 2-6 miles each day and complete 100-200 pushups and sit-ups per day.

73.     In August 2019, over a month into the Alexandria Police Academy training, Ms. Whatley re-injured her knee due to the physically rigorous nature of the course.

74.     After reaggravating the knee injury, the Marshal's office failed to accommodate her and forced her to take an extended leave. Ms. Whatley was put on indefinite leave.

75.     While Ms. Whatley was on leave, Defendant Hopewell fired her field partner, Deputy Butch MacKey because Defendant felt Deputy MacKey was too opinionated regarding Defendant's harassment of Ms. Whatley.

76.     Defendant Hopewell isolated Ms. Whatley from any and all support by barring other employees from interacting with her, reprimanding anyone who did, and ultimately firing those who voiced support for Ms. Whatley.

77.     Ms. Whatley later learned that, while she was on leave, Defendant Hopewell and Head Clerk Rhonda Hennigan held a meeting where they instructed employees Jaqueline McCoy and Shelia Bradley not to talk to Ms. Whatley and to "get rid of her."

78.     On November 6, 2019, Ms. Whatley sent a letter to Defendant Hopewell, requesting an accommodation per the recommendation of her treating orthopedic surgeon, Dr. Malcolm Stubbs of the Lafayette Bone and Joint Clinic.

79.     On November 12, 2019, Defendant Hopewell responded to Ms. Whatley's request for an accommodation by saying she could return to work, but did not include information about accommodations.

80.     On November 21, 2019, Ms. Whatley provided Defendant Hopewell with a note from Dr. Stubbs.

81.     On December 4, 2019, Defendant Hopewell requested a second doctor's note.

82.     On December 6, 2019, Defendant Hopewell finally indicated he would provide Ms. Whatley with an accommodation.

83.     On December 9, 2019, Ms. Whatley returned to work and was assigned to scan 20,000 files in the office she shared with Deputy Robertson and Deputy Reno.

84.     Ms. Whatley was told the position she was assigned to after her first injury, manning the front door, was not available because of her work restrictions.

85.     This did not make sense for several reasons. Namely, Ms. Whatley was allowed to work the front door position after her first injury when she had the same work restrictions. When working the front door, an employee could sit for 95% of the time.

86.     Defendant Hopewell told Ms. Whatley she could not work the front door because she did not have a firearm.

87.     The reason Ms. Whatley did not have a firearm was because Defendant Hopewell refused to let her carry one.

88.     Defendant Hopewell allowed Deputy Robertson to work the front door when he was recovering from a right shoulder injury.

89.     Deputy Robertson is right-handed and the injury prevented him from using his firearm.

90.     Instead, Ms. Whatley was confined to an office scanning documents out of public view, where Defendant and his employees could more easily harass her.

91.     On December 10, 2019, the day after Ms. Whatley returned to work, around 8:40 a.m., Deputy Robertson entered Ms. Whatley's office and commented that he would delete all Ms. Whatley's pictures off his phone. Ms. Whatley never sent any photos of herself to Defendant Hopewell or his employees and, to her knowledge, Deputy Robertson did not have any photos of her. Deputy Norwood was present during this exchange.

92.     Later that morning, at 9:50 a.m., Deputy Chris Pruitt said, "Kay, I need a favor. The FBI is after me and I need a place to hide my wiener can you help."

93.     Deputy Reno Nepa was in the office with Ms. Whatley at the time.

94.     At 2:42 p.m., Deputy Pruitt again entered Ms. Whatley's office and asked to see her "titties."

95.     Deputy Robertson entered and also asked to see Ms. Whatley's breasts.

96.     Chief Deputy Steve Boeta was present in the room and overheard the comments, but said nothing.

97.     On December 11, 2019, around 1:00 p.m., Deputy Robertson, Deputy Pruitt, and Chief Deputy Boeta entered Ms. Whatley's office and spoke about a woman they used to "gang bang."

98.     Deputy Robertson said "she could put her pussy over the gear shifter and fuck it."

99.     Deputy Robertson asked Ms. Whatley if she could do the same for them.

100.    Deputies Robertson and Pruit and Chief Deputy Boeta only stopped when Deputy Norwood entered the room and told them to leave Ms. Whatley alone.

101.    On that same date, December 11, 2019, Ms. Whatley met the man Defendant hired to man the front door. The new hire had difficulty walking and was taken to the hospital that same

day when he injured himself attempting to step out of a vehicle. He had to be taken to the hospital in ambulance. Defendant still allowed him to return to the front door position.

102.    Ms. Whatley was surprised because she was in much better physical condition than this new hire, yet Defendant Hopewell told Ms. Whatley she was physically incapable of returning to this position.

103.    On December 18, 2019, around 10:30 a.m., Ms. Whatley had to leave work. When she walked outside, Chief Deputy Boeta, Deputy Pruitt, and Deputy Robertson, and an inmate in the work-release program were outside. Ms. Whatley told Chief Deputy Boeta she had to go home to open her garage so her mom could get into the house, and that she would return shortly. Deputy Pruitt announced to everyone that Ms. Whatley was "going home for a quick fuck on lunch." Deputy Robertson said that Ms. Whatley "opens [her] garage for everyone." They all laughed, including Defendant Boeta.

104.    Defendant and his employees routinely sexually harassed Ms. Whatley in front of new hires and other non-employee workers.

105.    On December 19, 2019, around 10:05 a.m., Deputy Robertson said "y'all smell something burning?" and added "that's Kay's fatass thighs."

106.    Deputy Robertson then asked Ms. Whatley to smell his finger and guess what he had been doing.

107.    This exchange occurred in front of Deputies Boeta and Pruitt.

108.    Deputy Robertson was referencing the fact that Ms. Whatley had gained around twenty pounds.

109.    Deputies Robertson and Pruitt frequently commented on her weight gain.

110.    Ms. Whatley had gained weight due to the stress and anxiety she felt working in a hostile environment and being subjected to constant sexual harassment. Ms. Whatley cried over these comments and felt it was a struggle to continue going into work each day.

111.    When Defendant and his employees discovered the identity of Ms. Whatley's boyfriend, they used office computers to print unflattering posters of him, and posted those up around the office.

112.    They also made disparaging comments about him, and told Ms. Whatley she could not date him.

113.    This severely impacted Ms. Whatley's romantic relationship and the constant harassment related to her relationship caused her to breakup with her boyfriend.

114.    Ms. Whatley was treating with Dr. John Hill, a Psychiatry Specialist, in Alexandria. During this time, Ms. Whatley had to receive counseling more frequently and was prescribed anti-anxiety medication.

115.    At one point Jaqueline McCoy encountered Ms. Whatley crying and attempted to comfort Ms. Whatley. She befriended Ms. Whatley and openly showed kindness and support for her. Defendant Hopewell fired Ms. McCoy when he learned of this.

116.    In Mid-December 2019, Ms. Whatley again complained to her superiors, Defendant Hopewell and Defendant Boeta about the sexual harassment and Defendant's disclosure of her private medical information.

117.    Defendant Hopewell told Ms. Whatley that he had spoken with her attorney about it and thought it would be best if Ms. Whatley went home until she was able to return to full duty.

118.    On January 1, 2020, around 11:59 a.m., Deputy Robertson told Ms. Whatley, "if you were a good bitch you would continue to take my ethics training classes for me."

119.    Deputy Norwood was present when Deputy Robertson made this comment.

120.    On January 6, 2020, at a meeting in front of all the office staff, Chief Deputy Boeta stated there was no rush on the work Ms. Whatley was responsible for doing. He noted the work could take up to a year. However, Defendant instructed Ms. Whatley to report her work progress every day. No other employees were required to account for their job production in this manner.

121.    In addition to requiring Ms. Whatley to account for her work progress each day, Defendant Hopewell drastically restricted Ms. Whatley's freedom of movement in the office. Defendant Hopewell told Ms. Whatley she was only allowed to walk within her office space and the hallway, and to keep her trips across the hallway to a minimum.

122.    On January 7, 2020, around 9:34 a.m., Deputy Robertson asked Ms. Whatley why she had so many buttons on her shirt.

123.    Deputy Robertson told Ms. Whatley he could unbutton her shirt and that she would like being handcuffed.

124.    Deputy Robertson then added that he had taken his "blue pill" and "my dick is hard as a rock for you to come ride."

125.    This exchange occurred in front of Chief Deputy Boeta, Deputy Norwood, and a new hire, Deputy Jay Slater. Deputy Norwood is the only one who told Deputy Robertson to stop.

126.    On January 9, 2020, around 10:30 a.m., Deputy Robertson and Deputy Norwood were in the middle office eating Vienna sausages. Deputy Robertson stated that the Vienna sausages looked "like little dicks with cum coming out." Deputy Robertson then asked Ms. Whatley if she wanted some.

127. On January 10, 2020, around 8:00 a.m., Deputy Robertson told Ms. Whatley she could make a living out of "charging people rent for your bed" and added that Ms. Whatley let many different people in it already.

128. The new hire, Deputy Slater, was present and overheard the comment.

129. Later that day, on January 10, 2020, Ms. Whatley again reported the harassment to her supervisors Chief Deputy Boeta and Defendant Hopewell. Ms. Whatley noted that Defendant Hopewell had been making it a point to acknowledge everyone in the office while ignoring her as if she was not there.

130. When Ms. Whatley spoke with Chief Deputy Boeta, she asked him to explain certain comments made by Head Clerk Rhonda Hennigan. Ms. Hennigan had said, "we can't wait until Kay is gone." Ms. Whatley asked Chief Deputy Boeta who Ms. Hennigan was referring to when she said "we." Chief Deputy Boeta told Ms. Whatley he did not know, and reassured Ms. Whatley that she was doing her job well.

131. On January 13, 2020, Ms. Whatley filed a charge with the Equal Employment Opportunity Commission.

132. On the same day Ms. Whatley filed an EEOC Charge, Defendant Hopewell, Chief Deputy Boeta, and Ms. Hennigan retaliated against Ms. Whatley by giving her write up for "disrupting" the office because of the threat to sue implicit in an EEOC charge. See Fig. 1, below.

133.    Prior to this, Ms. Whatley had never been given an evaluation or been written up.

**Figure 1**:    On the <u>same day</u> as the filing of her EEOC complaint, Defendant gave Ms. Whatley a written disciplinary warning because she "threatened to sue" the City Marshal's Office.



134.    On January 16, 2020, Defendant Hopewell retaliated by <u>installing a camera</u> in Ms. Whatley's office, pointed directly at her without her knowledge.

135.     On January 22, 2020, Deputy Robertson and Deputy Norwood entered Ms. Whatley's office and quietly directed her attention to the camera. Deputy Robertson later told Ms. Whatley that Defendant Hopewell bragged he could access the camera from his cell phone and watch Ms. Whatley in the office at any time.

136.     Deputy Norwood, referencing the EEOC charge, told Ms. Whatley, "I'm not mad at you. I understand why you did it."

137.     Ms. Whatley's psychiatrist, Dr. Hill, recommended that Ms. Whatley take two weeks off due to extreme hostility of her work environment and the severe distress it was causing her.

138.     During the two weeks Ms. Whatley was out of the office, Defendant Hopewell fired Ms. McCoy because he learned she had spoken with Ms. Whatley.

139.     Speaking to Ms. Whatley was against Defendant Hopewell's order telling employees they could not interact with Ms. Whatley.

140.     The harassment and retaliation had become so severe by this point as to constitute a constructive termination of Ms. Whatley.

141.     On February 4, 2020, Ms. Whatley submitted her resignation letter effective immediately, "due to the stress of being subject to a hostile work environment consisting of sexual harassment, discrimination and retaliation for exercising [her] rights after filing a complaint with the EEOC."

142.     On March 2, 2021, the EEOC issued Ms. Whatley a Right to Sue letter.

143.     In short, Ms. Whatley endured incessant sexual harassment and harassment related to her disability from her superiors and co-worker, but Defendant Hopwell retaliated against Ms. Whatley by escalating the harassment, disciplining her, and retaliating against her until she

resigned instead of addressing the problem. Meanwhile, her harassers are all still employed with the Alexandria City Marshal's Office.

144.     As a result, Ms. Whatley suffered a loss of wages, as well as damages related to the emotional and physical toll of the enduring discrimination and battery.

## V.     CAUSES OF ACTION

### *Count One* – **Violation of Title VII of the Civil Rights Act**

145.     Plaintiff realleges and incorporates each and every foregoing paragraph.

146.     Title VII of the Civil Rights Act bars gender discrimination in the form of workplace sexual harassment. Civil Rights Act of 1964, § 701 *et seq.*, as amended, 42 U.S.C.A. § 2000e *et seq*.

147.     A hostile work environment resulting from sexual harassment is a kind of gender discrimination that violates Title VII. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66, 106 S. Ct. 2399, 2405, 91 L. Ed. 2d 49 (1986).

148.     A prima facie case of hostile work environment requires: (a) the employee belongs to a protected group, (b) the employee was subject to unwelcome sexual harassment, (c) the harassment was based on sex, (d) the harassment affected a "term, condition, or privilege of employment," and (e) *respondeat superior* (*i.e.*, the employer knew or should have known of the harassment and failed to take remedial action). *Jones v. Flagship Int'l*, 793 F.2d 714, 719–20 (5th Cir. 1986). Where the harasser is a supervisor, this last element can be eliminated. *Watts v. Kroger Co.,* 170 F.3d 505, 509 (5th Cir. 1999).

149.     For behavior to be harassment, the conduct must be unwelcome "in the sense that the employee did not solicit or incite it, and in the sense that the employee regarded the conduct as undesirable or offensive." EEOC Compl. Man. (CCH) P3114 (Mar. 19, 1990) (quoting *Henson*

*v. City of Dundee*, 682 F.2d 897, 903 (11th Cir. 1982). Sometimes behavior from the plaintiff appears to welcome or encourage the harassment, when in fact that reciprocation of sexual behavior was coerced. *See Phillips v Smaelly Maintenance Serv., Inc.* 711 F.2d 1524 (11th Cir. 1983) (holding lower court correct to consider that the alleged harasser knew plaintiff needed job to make house payments and exploited her financial need to solicit sexual relations).

150.    Harassment affects a "term, condition, or privilege of employment" when it is "sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment." *Royal v. CCC & R Tres Arboles, L.L.C.,* 736 F.3d 396, 401 (5th Cir. 2013), quoting *Harvill v. Westward Commc'ns, L.L.C.,* 433 F.3d 428, 434 (5th Cir. 2005) (quoting *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S. Ct. 2399, 91 L.Ed. 2d 49 (1986)). In *Lauderdale v. Texas Dep't of Criminal Justice, Institutional Div.*, the employee had a viable hostile work environment due to the "frequency of unwanted attention," where her harasser repeatedly called her, asked to "snuggle," and repeatedly asked to get coffee after work. *Lauderdale v. Texas Dep't of Criminal Justice, Institutional Div.,* 512 F.3d 157, 164 (5th Cir. 2007). The Fifth Circuit found that "[g]iven this pervasiveness, the level of severity necessary to establish an altered work environment is diminished." *Id*.

151.    An employer may take advantage of an affirmative defense against sexual harassment if it can show: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher v. City of Boca Raton*, 524 U.S. 775, 807, 118 S. Ct. 2275, 2293, 141 L. Ed. 2d 662 (1998).

152.    No affirmative defense is available, however, when the supervisor's harassment

culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment. *Id.* at 2279. This is *quid pro quo* harassment, and results in strict liability for the employer. *See* EEOC Enforcement Guidance, "Vicarious Employer Responsibility for Unlawful Harassment by Supervisors" (June 18, 1999).

153.    Title VII, specifically 42 U.S.C. § 2000e-3 makes it unlawful for an employer to retaliate against an employee who has opposed an unlawful employment practice, or a practice they reasonably believed to be unlawful.

154.    Here, Ms. Whatley was the subject of pervasive unwanted sexual harassment over a period of years and the harassment increased after disability accommodation, until she resigned.

155.    The harassment was allowed to continue, despite Ms. Whatley appealing to her supervisors, two of whom actually participated in the harassment and threatened her not to continue reporting said harassment.

156.    Ms. Whatley did not welcome this behavior from her coworkers and superiors. She did her best to deflect or ignore this behavior. She reported it on multiple occasions and her complaints were ignored.

157.    The hostile work environment was pervasive and ongoing and Ms. Whatley's efforts to mitigate the harassment only made her the subject of further harassment.

158.    Ms. Whatley was in a protected class, as a woman.

159.    The behavior of Ms. Whatley's coworkers and superiors went beyond merely "distasteful," and included explicit invitations to conduct sexual acts. *See Meritor Savings Bank v. Vinson*, 477 U.S. 57 (1986). Their behavior was offensive, severe, unwelcome, and pervasive.

160.    The pervasiveness of the conduct created a hostile work environment that was severe enough to affect the terms, conditions, and privileges of employment.

161.    Defendant Hopewell, through pervasive sexual harassment, created a hostile work environment for Ms. Whatley.

162.    When Defendant Hopewell disciplined Ms. Whatley for filing an EEOC charge, he committed retaliation.

163.    Defendant Hopewell's conduct was intentional and done with malice or with reckless indifference to the federally-protected rights of Ms. Whatley.

164.    As the City Marshal, Jerome Hopewell was aware of the requirements of federal law. He explicitly rejected those requirements as not applying to the Alexandria City Marshal's Office.

165.    Defendant Hopewell's actions have caused Ms. Whatley to suffer mental, emotional, physical, and psychological harm.

166.    Ms. Whatley suffered a loss of present and future wages, employment benefits, and future career opportunities as a result of Defendant Hopewell's unlawful conduct.

167.    On January 13, 2020, Ms. Whatley filed Charge of Discrimination No. 461-2020-00865 with the Equal Employment Opportunity Commission.

168.    On March 2, 2021, Ms. Whatley was issued a Right to Sue Letter.

### *Count Two* – Retaliation in Violation of Title VII of the Civil Rights Act

169.    Plaintiff realleges and incorporates each and every foregoing paragraph.

170.    Title VII of the Civil Rights Act also protects employees who suffer an adverse employment action because they engaged in a protected activity. *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 408 (5th Cir. 1999).

171.    Many activities are considered "protected" under Title VII, including but not limited to reporting or opposing harassment. *Carter v. Town of Benton*, 827 F.Supp.2d 700 (W.D. La. 2010).

172.    Here, Ms. Whatley reported harassment to Defendant Hopewell, who responded by ignoring her complaints, escalating the hostilities and sexual harassment, and retaliating against her until she resigned.

173.    Ms. Whatley reasonably believed that the practices she complained of were unlawful.

174.    Defendant Hopewell installed cameras in Ms. Whatley's office, limited her movements, and required her to account for her productivity – no other employees were subject to such requirements and restrictions.

175.    Increased scrutiny can be retaliation under Title VII. *Mahbod v. Jones,* 13-cv-5546 (E.D. La. May 19, 2014) (increased scrutiny of work after filing EEOC claim stated a claim for retaliation under Title VII).

176.    A camera pointed directly at Ms. Whatley is increased scrutiny.

177.    These restrictions and requirements of Ms. Whatley's employment would not have been implemented but for her reporting the harassment, as it occurred directly in response to her reporting.

178.    That Defendant Hopewell fabricated reasons to write-up an employee to avoid legal liability suggests that Defendant did not act in good faith.

### *Count Three*– Violation of Rights Under the Americans with Disabilities Act

179.    Plaintiff realleges and incorporates each and every foregoing paragraph.

180.     A disability under the ADA is "an impairment that substantially limits one or more major life activities, a record of such an impairment, or being regarded as having a disability." 42 U.S.C. § 12102(1); 29 C.F.R. § 1630.2(g).

181.     In January, 2018, Ms. Whatley suffered a disabling knee injury while attending mandatory Alexandria Police Academy training.

182.     Ms. Whatley's physical impairment resulting from her knee injury reduced her ability to stand for long periods of time. Thus, she qualifies as a person with a disability under the ADA. *See Swanson v. Village of Flossmoor,* 794 F.3d 820, 827 (7th Cir. 2015) (finding that an officer who, after suffering a stroke, was required by a doctor to work part-time as requiring this reasonable accommodation under the ADA). *See also Rodriguez Diaz v. Big K-Mart*, 582 F.Supp.2d 147, 153 (D.P.R. 2008) (finding complaint sufficiently alleged disability discrimination under the ADA, where plaintiff's disability allegation was that she suffered post-stroke impairments that substantially limited major life activities by causing increased pain and longer time to complete tasks than the average person).

183.     Alternatively, Ms. Whatley meets the definition of disability under the ADA by the fact that Defendant had a record of her disability. 42 U.S.C. § 12102(1)(B). On or about November 21, 2019, Ms. Whatley gave Defendant Hopewell the letter from her doctor, Dr. Malcolm Stubbs from the Lafayette Bone and Joint Clinic, stating her diagnosis, symptoms, and recommended occupation accommodations.

184.     Also, Ms. Whatley meets the definition of disability under the ADA by the fact that Defendant Hopewell regarded Ms. Whatley of having a disability. 42 U.S.C. § 12102(1)(C). Defendant Hopewell in his own assessment of her symptoms found that she could not even work the front door position, which entailed sitting for 95% of the time.

185.     After Ms. Whatley was denied an accommodation at the police academy and subsequently aggravated her knee injury, Defendant Hopewell refused to allow her to return to the position she previously manning the front door, for which she was qualified under 42 U.S.C. § 12111(8), and instead placed her in a position where they could more easily subject her to constant sexual harassment, limit her interactions, and restrict her freedom of movement.

186.     An employee with a disability is entitled to reasonable accommodations that do not constitute an undue hardship on the employer. 42 U.S.C. § 12112(b)(5)(A); 29 C.F.R. § 1630.9.

187.     An employer is obligated to engage in an interactive process with the employee that identifies the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations. 29 C.F.R. § 1630.2(o)(3). This interactive process is mandatory. *Stokes v. Nielsen*, 751 Fed.Appx. 451, 455 (5th Cir. Oct. 8, 2018).

188.     Ms. Whatley requested a reasonable accommodation from Defendant Hopewell, and she was denied the accommodation without explanation. The accommodations she sought were not an undue burden on Defendant.

189.     Further, Defendant Hopewell failed to engage Ms. Whatley in the interactive process. Defendant ignored or denied Ms. Whatley's requests for accommodation. Defendant should have engaged in a back-and-forth dialogue to determine the precise limitations and consider any other available accommodations within the employment positions available within Alexandria City Marshal's Office. When Ms. Whatley attempted to engage with her employer, she was retaliated against and heard through her supervisor that Defendant wanted her gone.

190.     When Defendant refused to accommodate Ms. Whatley's disability, he violated her employment rights under the ADA. Defendant further violated Ms. Whatley's rights under the ADA when he failed to engage in the interactive process.

### *Count Four* – Violation of Americans with Disabilities Act: Retaliation

191.     Plaintiff realleges and incorporates each and every foregoing paragraph.

192.     A request for a reasonable accommodation of a disability is a protected activity under the Americans with Disabilities Act. *Jenkins v. Cleco Power, LLC*, 487 F. 3d 309, 316-17 (5th Cir. 2007). Retaliation for such requests is unlawful under 42 U.S.C. § 12203(a).

193.     Ms. Whatley engaged in a protected activity when she requested a reasonable accommodation due to her knee injury and the aggravation of her knee injury, and she suffered an adverse employment action by escalating sexual harassment and hostilities after she was removed from the field.

194.     When Defendant escalated the sexual harassment of Ms. Whatley and escalated the hostilities towards her by disclosing her private medical information and mocking her health conditions following her request for an accommodation, he unlawfully retaliated under the Americans with Disabilities Act.

### *Count Five* - Louisiana Employment Discrimination Law

195.     Plaintiff realleges and incorporate each and every foregoing paragraph.

196.     La. R.S. 23:332(A)(1) makes it unlawful to discriminate against any individual in employment based on their sex.

197.     The Louisiana anti-discrimination law shares a similar scope and applicability to its federal counterparts plead herein. *White v. Golden*, 982 So.2d 234, 243 (La. App. 2008).

198.     By the conduct alleged herein, Defendant subjected Ms. Whatley to gender discrimination in the form of hostile workplace sexual harassment, *quid pro quo* sexual harassment, and retaliation in violation of the Louisiana Employment Discrimination Law.

199.     Additionally, Ms. Whatley's physical impairments resulting from her knee injury

satisfy the disability requirement under La. R.S. 23:322(3).

200.    She is otherwise qualified under La. R.S. 23:322(8) because she can perform the essential functions of the Front Door position or other administrative position within Alexandria City Marshal's Office with a reasonable accommodation.

201.    No employer may fail or refuse to reasonably accommodate an otherwise qualified person with a disability on the basis of a disability, when it is unrelated to the individual's ability, with reasonable accommodation, to perform the duties of a particular job or position. La. R.S. 23:323(B)(1).

202.    No employer may discharge or otherwise discriminate against an otherwise qualified person with a disability with respect to compensation or the terms, conditions, or privileges of employment on the basis of a disability when it is unrelated to the individual's ability to perform the duties of a particular job or position. La. R.S. 23:323(B)(2).

203.    When Defendant escalated the sexual harassment of Ms. Whatley and escalated the hostilities towards her by disclosing her private medical information and mocking her health conditions following her request for an accommodation, they unlawfully retaliated under Louisiana Employment Discrimination Law.

### Count Six – State Law Direct Action Claim

*Against XYZ Insurance Companies*

204.    Plaintiff incorporates and reasserts the allegations in each preceding and following paragraphs of this Complaint.

205.    Defendant XYZ Insurance Companies, upon information and belief, have issued and/or currently have in effect one or more policies of insurance covering Defendant named herein. For valuable consideration received, these policies obligated Defendant Insurance Companies,

jointly and/or severally, to pay on behalf of their insured Defendant(s) any sums the insured Defendant(s) may become obligated to pay to Plaintiff or to indemnify their insured Defendant(s) for any sums the insured Defendant(s) may become obligated to pay to Plaintiff.

206.     By reason of their illegal and unconstitutional acts, Defendant is liable to Plaintiff for all damages and injuries they have suffered as a result. Upon information and belief, Defendant Insurance Companies are contractually obligated to pay these sums on behalf of the insured Defendant(s).

207.     Upon information and belief, Defendant Insurance Companies are liable to Plaintiff for any and all damages incurred by reason of the insured Defendant(s)' acts, up to their policy limits, notwithstanding the fact that the insured Defendant(s) may themselves be able to assert claims of privilege or immunity from liability.

208.     Under Louisiana Revised Statute § 22:655(B), Plaintiff brings a direct action against Defendant Insurance Companies to recover any and all sums they are obligated to pay Plaintiff on behalf of their insureds or to indemnify their insureds.

## RELIEF REQUESTED

209.     Wherefore Plaintiff prays for judgment against Defendant as follows:

(a) For a judgment against Defendant for all asserted causes of action;

(b) For a judgment awarding compensatory damages;

(c) For a judgment awarding special damages, including punitive damages;

(d) For a judgment awarding Plaintiff her costs and attorney's fees;

(e) For a judgment awarding pre- and post-judgment interest at the highest rates allowed by law; and

(f) For all other and further relief as may be necessary and appropriate.

210.    Plaintiff states any and all other causes of action that may become known through a trial of this matter on its merits against any and all other parties which are herein named or which may be added later, and request any and all other damages or remedies which this Court may seem equitable.

211.    Plaintiff reserves the right to notice of defect to this pleading and reserves the right to amend or supplement this Petition after discovery of any additional fact, law, or claim, the amendment of which to be performed by the filing of any subsequent pleading.

## JURY DEMAND

Plaintiff respectfully requests a trial by jury on all issues so triable.

Respectfully Submitted:

**MOST & ASSOCIATES**

*/s/ Hope A. Phelps*
**HOPE PHELPS (La. Bar No. 37259)**
**WILLIAM MOST (La. Bar No. 36914)**
**DAVID LANSER (La. Bar No. 37764)**
**CAROLINE GABRIEL (La. Bar. No. 38224)**
201 St. Charles Ave., Ste. 114, # 101
New Orleans, LA 70170
Tel: 504.256.4615
Email: hopeaphelps@outlook.com

***Counsel for Plaintiff, Patricia "Kay" Whatley***